UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

BART DAL PONTE,                       :
                                      :      HONORABLE JOSEPH E. IRENAS
          Plaintiff,                  :
                                      :      CIVIL ACTION NO. 04-2152 (JEI)
     v.                               :
                                      :            **OPINION**
AMERICAN MORTGAGE EXPRESS             :
CORP., and AMERICAN                   :
RESIDENTIAL LENDING CORP.,            :
                                      :
          Defendants.                 :

**APPEARANCES:**

TRUJILLO RODRIGUEZ & RICHARDS, LLC
By: Donna Siegel Moffa, Esq.
Peter Winebrake, Esq.
8 Kings Highway West
Haddonfield, New Jersey 08033

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
By: Kelly M. Dermody, Esq.
Caryn Becker, Esq.
Daniel E. Seltz, Esq.
Embarcadero Center West, 30th Floor
275 Battery Street
San Francisco, California 9411-3339
     Counsel for Plaintiff.

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
By: Fredric R. Cohen, Esq.
4300 Haddonfield Road, Suite 311
Pennsauken, New Jersey 08109

RICHMAN & FERREN
By: Edwin T. Ferren, Esq.
41 Grove Street
Haddonfield, New Jersey 08033
     Counsel for Defendants.


**IRENAS**, Senior District Judge:

     The instant action arises from the rejection by Defendant

1

American Mortgage Express Corp. ("AMX") of two loan applications submitted by Plaintiff Bart Dal Ponte ("Dal Ponte") and AMX's subsequent making of the loans to Dal Ponte at a higher interest rate.[1]  Presently before the Court are Dal Ponte's Motion for Class Certification and AMX's Cross-Motion for Summary Judgment.

## I.

On or about June 3, 2003, Dal Ponte called AMX's Mt. Laurel office in response to an AMX newspaper advertisement.  Dal Ponte spoke with Robert Lewandowski ("Lewandowski"), an AMX loan officer, seeking to refinance loans on two residential properties owned by Dal Ponte in California.  Dal Ponte initiated the application process and paid a fee of $375 for each loan with his credit card.  Dal Ponte contends that Lewandowski then informed him that AMX would "lock in" a 4.25% interest rate until July 29, 2003.

AMX sent Dal Ponte standard loan application packages for each property, which included cover letters stating: "Please be advised that due to the time sensitive nature of your rate lock-in agreement, we can only honor your interest rate lock agreement upon receipt of your signed loan application within 10 days

---

[1] Defendant American Residential Lending Corp. is a wholly owned subsidiary of AMX.  The Court will refer to both Defendants collectively as "AMX," as the parties have done throughout their briefs.

2

(including weekends and holidays) of the date of this letter: 06/15/03." (Opp'n to Mot. for Summ. J., Moffa Decl., Ex. A)(underline in original).  The letter also included a list of supporting documents that could be returned with the loan application or sent at a later date.

The application forms enclosed with the letter included: (a) "Interest Rate Lock In Agreement;" (b) "Uniform Residential Loan Application;" (c) "Federal Truth-In-Lending Disclosure Statement; (d) "Application Disclosure;" (e) "Borrower's Certification & Authorization;" (f) "ECOA Notice;" and (g) "Mortgage Servicing Transfer Disclosure." (Cohen Decl., Ex. 4)  Dal Ponte executed and returned the signed applications within ten days.

AMX later informed Dal Ponte that his loans were cancelled because he failed to timely submit a subordination agreement for his property in Lake Arrowhead, California.  AMX contends that Dal Ponte also failed to submit a title report on his Los Angeles, California, property.  Dal Ponte argues that AMX never told him that this was the reason for the declination of his loan application for the Los Angeles property.  AMX told Dal Ponte that the 4.25% interest rate was no longer available, but offered to resell the loans at the interest rate of 4.875%.

Dal Ponte contends that his loan applications were part of a mass cancellation scheme instituted by AMX during the summer of 2003.  He maintains that due to rising interest rates, AMX

cancelled a number of loans subject to interest rate lock in agreements, including his, because the loans were no longer profitable at the locked in rates.

AMX distributed a "Cancelled Loans" list which included loan applications of approximately 250 customers of AMX's Mt. Laurel office.  (Opp'n to Mot. for Summ. J., Moffa Decl., Ex. N)  Dal Ponte contends the other customers on this list heard the same sales pitch including the interest rate lock in option and received the same application materials, including interest rate lock in agreements.[2]  He also maintains that AMX managers instructed the loan officers to attempt to resell these cancelled loans at higher interest rates and to "lie, if necessary, to accomplish this."  (Pl. Counter-Statement of Material Facts, at ¶ 10)

Dal Ponte filed the instant Complaint on May 6, 2004, on behalf of himself and all other AMX customers who were subject to AMX's alleged mass cancellation scheme in the summer of 2003. Dal Ponte maintains that AMX is liable to each member of the proposed class under the Truth In Lending Act, 15 U.S.C. § § 1601 *et seq.* ("TILA"), the New Jersey Consumer Fraud Act, N.J.S.A. § § 56:8-2 *et seq.* ("NJCFA"), and for common law breach of

---

[2] Dal Ponte's name does not appear on this list.

4

contract and unjust enrichment.[3]

## II.

Dal Ponte seeks certification of a class defined as:

All consumers who applied for a loan with the Mount Laurel office of Defendant American Mortgage Express between May 1, 2003 and July 23, 2003, paid for a locked-in interest rate, and were not given the locked-in interest rate by Defendant.

(Pl. Br., Cert. Mot., at 10.)  He alleges that every member of this class "was subject to the same course of conduct – Defendant's mass cancellation scheme."  (Id.)

Fed. R. Civ. P. 23 sets a two-prong standard for class certification.  Rule 23(a) sets forth the "threshold requirements for all class actions."  *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 183 (D.N.J. 2003).  Rule 23(b) describes the three categories of class actions within the Rule and the specific requirements of each category.  In order to succeed on his Motion for Class Certification, Dal Ponte must establish that all four requisites of Rule 23(a) and at least one aspect of Rule 23(b) are met.  *See Chiang v. Veneman*, 385 F.3d 256, 264 (3d Cir. 2004).

---

[3] The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Dal Ponte's claim arising under the Truth In Lending Act.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining claims, as they are so related to the federal claim that they form part of the same case or controversy.

5

The Court's focus in deciding a motion under Rule 23 is on whether a class action is an appropriate vehicle for litigation the claims alleged, and not on the merits of the case. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *Chiang*, 385 F.3d at 269-70.  Nevertheless, in certain instances the Court may need "to analyze the elements of the parties' substantive claims and review facts revealed in discovery in order to evaluate whether the requirements of Rule 23 have been satisfied."  *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 339 (D.N.J. 1997); *see also Weisfield v. Sun Chemical Corp.*, 210 F.R.D. 136, 139 (D.N.J. 2002).

A.  Rule 23(a) Requirements

Fed. R. Civ. P. 23(a) creates four requirements for the maintenance of a class action: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  These requirements are commonly known as numerosity, commonality, typicality and adequacy.  As discussed below, the Court concludes that Dal Ponte has satisfied the requirements of Rule 23(a).

1.  Numerosity

     "The numerosity requirement is intended to limit the class action device to those cases in which the number of parties makes traditional joinder of parties unworkable.  By modern, complex litigation standards the minimum number of parties is not large . . . ."  *In re Mercedes-Benz*, 213 F.R.D. at 185.  A plaintiff need not demonstrate that the potential class members are so numerous that joinder of every class member is impossible, but rather, "proof of 'difficulty or inconvenience of joining all members of the class' suffices."  *Weisfeld*, 210 F.R.D. at 139 (citations omitted).  Dal Ponte contends that the proposed class consists of the approximately 250 AMX customers on the cancelled loans list, as well as any AMX customers who were "upsold" during the class period and any other customers whose loans were cancelled by AMX.

     AMX contends, however, that the majority of these potential class members, including Dal Ponte, must be excluded from the class because "AMX cannot possibly have any legal liability toward any such individual" because they either withdrew their loan applications, failed to timely submit required documentation or were denied loans for "legitimate credit reason[s]."  (Def. Br., Cert. Mot., at 26.)  It argues that the only proper class members are "individuals who timely submitted applications and underwriting data to AMX; and were denied applications at the

7

lock rate because of rate and not credit reasons." (Id.) AMX's arguments are clearly addressed to the merits of the claims of the proposed class members, but "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen*, 417 U.S. at 178.

The Court concludes that the proposed class, as presently defined, is sufficiently numerous as to satisfy Rule 23(a). The joinder of 250 individuals as plaintiffs would clearly be unworkable, especially given that the proposed class includes individuals from across the country. *See Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.").

2. Commonality

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class. Because the requirement may be satisfied by a single common issue, it is easily met . . . ." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Dal Ponte has

8

identified several common issues of fact and law, including
whether AMX implemented a mass cancellation policy that affected
all proposed class members.  He has presented sufficient evidence
at this stage to support his allegation that AMX engaged in "a
uniform course of conduct common to all class members subject to
common proof in a single trial."  *Chiang*, 385 F.3d at 266; *see
also Zacharjasz v. Lomas & Nettleton Co.*, CIV. A. No. 87-4303,
1988 WL 54066 at *2 (E.D. Pa. May 23, 1988)(finding commonality
requirement satisfied where "[t]hese common questions include:
whether defendant had a policy of promoting 'lock-in' interest
rates with specified approval schedules; whether defendant's
officers or local representatives knew or had reason to suspect
that defendant could not process the applications within the
scheduled time; whether defendant's representatives informed the
mortgage applicants that the applications might not be completed
on schedule").[4]

Additionally, the TILA claim presents several common
questions of law and fact.  Dal Ponte has alleged that AMX
employed uniform loan application forms and materials and made
common representations to all potential class members.  He
contends these communications included misleading information

---

[4]The Court notes that the Third Circuit has set a low bar
for the commonality requirement, and thus AMX's arguments
regarding the applicable law are best addressed in the context of
Rule 23(b)(3)'s requirement that common issues predominate.

regarding the applicable interest rate, in violation of the mandatory disclosure provisions of TILA.  The sufficiency and clarity of AMX's disclosures is an issue common to all potential class members.  Moreover, the Third Circuit has "squarely held that reliance is not an element of a cause of action under TILA." *Schnall v. Amboy Nat'l Bank*, 279 F.3d 205, 217-18 (3d Cir. 2002)(listing circuits that have held that no proof of reliance or actual damages is necessary to recover statutory damages under TILA).

3.  Typicality

"The typicality inquiry centers on whether the interests of the named plaintiffs align with the interests of the absent members." *Stewart*, 275 F.3d at 227.  "[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Baby Neal*, 43 F.3d at 58.  The Court concludes that Dal Ponte has satisfied the typicality requirement.

Dal Ponte's claims arise from AMX's alleged mass cancellation policy, as do the claims of the proposed class members.  *See Weisfeld*, 210 F.R.D. at 140 ("'[I]n instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong

10

assumption that the claims of the representative parties will be typical of the absent class members.'")(citation omitted). Moreover, there is no conflict between the legal or factual positions advanced by Dal Ponte and those of the class members, as they share an interest in establishing the illegal actions and liability of AMX under the NJCFA, TILA and common law.

4.  Adequacy

The Third Circuit has adopted a two-prong test for determinating the adequacy of representation by the named plaintiff and his counsel: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975).  It is undisputed that Dal Ponte's counsel have substantial knowledge of and experience in class action and consumer litigation, and are committed to dedicating significant resources to and pursuing this litigation.  As noted above, the Court sees no conflict between the interests of Dal Ponte and the class members, nor any reason why he would be unable to vigorously pursue these claims on behalf of the class.[5]

---

[5]AMX repeatedly asserts that certification is inappropriate because Dal Ponte is not a proper class member, as he did not timely submit required documents.  The Court reiterates that

11

B.  Rule 23(b) requirements

Dal Ponte seeks class certification under Rule 23(b)(3), which provides that a class action may be maintained if a court finds that common questions of law or fact predominate over questions affecting only individual class members and the class action is the superior method for fair and efficient adjudication of the matter.

1.  Predominance

The issue of predominance is hotly contested in this matter, as the parties dispute which state's law should apply to the consumer fraud claims.  As a preliminary matter, the Court notes that "[i]n order to predominate, the common issues must constitute a 'significant part' of the individual cases." *Chiang*, 385 F.3d at 273.  AMX argues that this Court must apply the consumer fraud statutes of the states of residence of each proposed class member, rendering the class insufficiently cohesive and making class-wide relief impossible.  Dal Ponte

---

consideration of the merits of a plaintiff's claim is inappropriate at the class certification stage.  Moreover, we see no basis for AMX's contention that its proffered rationale for rejecting Dal Ponte's initial loan application creates a fatal conflict of interest between Dal Ponte and other class members. *See Weisfeld*, 210 F.R.D. at 140-41 (rejecting defendant's claim that its unique defenses to claims of named plaintiff rendered named plaintiff an inadequate representative, where defendant could not defend claims of class members on same grounds).

contends that the NJCFA should be applied to the claims of all class members.

(a) Choice of law

In order to assess whether common issues predominate, the Court must first establish which law to apply to Dal Ponte's state statutory consumer fraud claims.  In this Circuit, when a district court has original jurisdiction pursuant to § 1331 and exercises supplemental jurisdiction over pendant state law claims, the court must apply the forum state's choice of law rules to the state law claims.  *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 399 (3d Cir. 1987); *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 333 (D.N.J. 2005).  This Court will thus apply New Jersey's choice of law rules.  New Jersey applies a "flexible 'governmental interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation."  *Gantes v. Kason*, 145 N.J. 478, 484 (1996).

Under the governmental interest approach, the Court must "first determine whether a conflict exists between the laws of the interested states."  *Veazey v. Doremus*, 103 N.J. 244, 251 (1986).  If a conflict is found, the Court must then identify "the state with the greatest interest in governing the particular issue" by analyzing "the governmental policies underlying the law

13

of each state and how these policies are affected by each state's contacts to the litigation and the parties." *Id.*; *see also Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 634, 370-71 (D.N.J. 2004).

The parties have brought to the Court's attention two decisions from the New Jersey state courts that have identified a number of conflicts between the NJCFA and the consumer fraud statutes of other states, with regard to issues such as the amount of damages, the necessity of proof of detrimental reliance and the availability of private causes of action. *See Int'l Union of Operating Eng. Local 68 Welfare Fund v. Merck & Co.*, No. ATL-L-3015-03, 2005 WL 2205341 (Law Div. July 29, 2005) (concluding that the NJCFA applies and certifying nationwide class), *aff'd* 384 N.J. Super. 275 (App. Div. 2006); *Fink v. Ricoh Corp.*, 365 N.J. Super. 520 (Law Div. 2003)(concluding that the court must apply the consumer fraud statutes of the domiciliary states of the class members and denying class certification). In light of the detailed analyses of these opinions, the Court accepts that conflicts exist between the NJCFA and the consumer fraud statutes of other states.[6]

---

[6]Given the nature of the claims in this case and the evidence necessary to prove Dal Ponte's allegations, the Court notes that many of these conflicts are in fact illusory, especially with regard to reliance and actual damages. Furthermore, neither party has identified any conflicts between New Jersey common law on breach of contract and unjust enrichment, and the law of any other state. "Where the parties

14

Thus, the Court will proceed to identify the state with the most significant relationship with the parties and events of this litigation, and thus the greatest interest in having its law govern the state statutory consumer fraud claim.  We begin by examining the policies underlying the various consumer fraud statutes.  Consumer fraud statutes are designed to protect consumers from fraud or compensate them should fraud occur.  *See Merck*, 2005 WL 2205341 at *20 ("Logic, in addition to an analysis of other state laws, shows that all consumer fraud statutes are intended to discourage fraud and provide some level of protection to consumers.").  Additionally, consumer fraud statutes are designed to deter a state's businesses from engaging in fraudulent practices.  *Id.*

While the states differ in the level of protection and the stringency of punishments their consumer fraud statutes offer, these "differences do not represent competing or conflicting resolutions of a particular policy issue.  Rather [the laws] reflect a legislative determination to attack the same evil." *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 548

---

fail to point out or establish any difference in the laws of the various jurisdictions involved in a particular case, it is proper for the court to apply the law of the forum." *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998)(citing Restatement (Second) Conflict of Laws § 136 cmt. h (1971)).  Even assuming that conflicts exist, the rationale for applying the NJCFA to the proposed class members' claims supports the application of New Jersey common law here.

(D.N.J. 1998).  A state's choice of a particular strength or breadth of its consumer fraud provision may reflect other local concerns, such as the desire to attract businesses to relocate to the state, to limit litigation in the state's courts or to protect a state's many visitors to its tourist destinations.

"Whether the policy that underlies the law of a state gives rise to a governmental interest calling for the application of that state's law depends on the nature of the contacts that the state has to the litigation and to the parties." *Gantes v. Kason*, 145 N.J. 478, 487 (1996).  In light of the policies noted above, the Court concludes that New Jersey has the most significant contacts with and relationship to this litigation, and thus the NJCFA should be applied.

Many states can claim members of the proposed class as residents, including New Jersey.  These contacts are clearly relevant to the instant litigation, as each state has an interest in applying its consumer fraud laws to ensure that its citizens and domiciliaries are protected and compensated.  It is equally apparent, however, that the interests of these states would not be frustrated by the application of the NJCFA.  *See Fu v. Fu*, 160 N.J. 108, 122-23 (1999)("'If a strong state policy or interest will neither be fostered by applying that state's law, nor frustrated by the failure to apply it, it is highly unlikely that that state has any interest whatsoever in blanketing that

particular issue with its law.'")(quoting *White v. Smith*, 398 F. Supp. 130, 134 (D.N.J. 1975)).

"The available legislative history demonstrates that the [NJCFA] was intended to be 'one of the strongest consumer protection laws in the nation.'" *New Mea Construction Corp. v. Harper*, 203 N.J. Super. 486, 497 (App. Div. 1985). Both *Merck* and *Fink* concluded that the NJCFA generally provides a higher level of protection through measures that make it easier for consumer-plaintiffs to recover in lawsuits against businesses engaging in fraudulent practices. *See Merck*, 2005 WL 2205341, **20-38; *Fink*, 365 N.J. Super. at 570-74.

Moreover, there is no indication that the NJCFA excludes from its protections non-New Jersey residents who deal with New Jersey businesses. It provides a right of action to "any person who suffers any ascertainable loss . . . as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ." N.J.S.A. § 56:8-19. This Court has previously remarked that it "has little doubt that the New Jersey Legislature intended [the NJCFA] to apply to sales made by New Jersey sellers even if the buyer is an out-of-state resident and some aspect of the transaction took place outside New Jersey." *Boyes*, 27 F. Supp. 2d at 547.

It appears that none of the non-New Jersey class members would receive less protection under the NJCFA than their home-

state consumer fraud statutes, and thus no state's policy of providing protection for its residents will be frustrated.  As in *Merck*, this Court sees no reason "why [a] plaintiff's home state [would] want to deprive them of that protection," especially given that AMX is a New Jersey corporation.  2005 WL 2205341 at *38.

Additionally, New Jersey's interest in regulating its domestic businesses and in deterring fraudulent business practices is especially strong given this state's significant contacts to this litigation.  *See Gantes*, 145 N.J. at 492-97 (holding that New Jersey's interest in deterring the manufacture of defective products need not yield to Georgia's interest in compensating its citizens in light of lawsuit's material connection to New Jersey – manufacturer was a New Jersey corporation and product was manufactured in the state); *D'Agostino v. Johnson & Johnson, Inc.*, 133 N.J. 516, 539-40 (1993)(noting that application of New Jersey's *Pierce* doctrine to wrongful discharge claim by American former employee of Swiss subsidiary of New Jersey corporation was "not exporting New Jersey employment law so much as applying New Jersey domestic policy . . . to a domestic company").

AMX is a New Jersey corporation.  Its principal place of business is in Cherry Hill, New Jersey.  The loan officers who spoke with the proposed class members were employed in New

18

Jersey.  The loan applications of the proposed class members appearing on the cancelled loans list were processed in AMX's Mt. Laurel, New Jersey, branch office.  It appears also that the underwriting decisions for these applications were made in New Jersey.  While AMX served clients and provided financing for properties across the country, it conducted its part of the transactions in New Jersey.

The Court concludes that New Jersey has the strongest interest in applying its consumer fraud statute, as its policies of deterring fraudulent conduct by domestic businesses and compensating consumers who are victims of fraud by such businesses are significantly implicated by this litigation. Therefore, the Court will apply the NJCFA to all members of the class, including those who reside in states other than New Jersey.

(b) Individual versus common issues

The conclusion that application of the NJCFA is appropriate does not end our predominance inquiry.  We must now determine if the common issues in the NJCFA, TILA and common law claims are "both numerically and qualitatively substantial in relation to the issues peculiar to individual class members."  *In re Mercedes-Benz*, 213 F.R.D. at 186.  The existence of individual issues does not by itself defeat certification, but rather, they

19

must be less significant than the common issues and must not be
so unmanageable as to preclude class treatment. *Chiang*, 385 F.3d
at 273 (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.
1985)).  The Court must examine both factual issues and the
applicable law to determine if common questions predominate.
*Amchem Products, Inc., v. Windsor*, 521 U.S. 591, 623 (1997);
*Weisfeld*, 210 F.R.D. at 141.

At their core, each of Dal Ponte's claims allege that AMX
made certain representations orally and in writing to the
proposed class members that they could "lock in" a specific
interest rate by paying three hundred and seventy five dollars
and timely submitting certain paperwork.  He maintains that AMX
intended to disregard the interest rate "lock in" agreements
should they become unprofitable, and when interest rates
increased in the summer of 2003, AMX engaged in a broad scheme to
cancel loan applications subject to these agreements, including
denying loans based upon pretextual reasons.

The Supreme Court has stated that "[p]redominance is a test
readily met in certain cases alleging consumer or securities
fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at
625.  The Eastern District of Pennsylvania has certified a class
action in a case with remarkably similar allegations - a mortgage
lender accused of misrepresenting to mortgage loan applicants
that they could "lock in" an interest rate in exchange for

20

payment of a fee, despite having no intention to provide a loan at that interest rate.  *Zacharjasz*, 1988 WL 54066 at *1.

In *Zacharjasz*, the Court found that common issues predominated despite the fact that the class members' claims were based upon oral representations, which generally renders the individual issues predominate.  *Id.* at 3.  It noted, however, that "common questions may predominate where the oral representations were standardized or similar."  *Id.*; *see also Hanrahan v. Britt*, 174 F.R.D. 356, 365 (E.D. Pa. 1997)(citing *Zacharjasz* and listing cases in which courts held that common issues predominated where defendants made similar or standardized misleading oral representations).  Here, the claims involve both written and oral misrepresentations which Dal Ponte alleges were common to all proposed class members.  *See Kline v. First Western Government Securities, Inc.*, No. CIV.A. 83-1076, 1996 WL 153641 at *12 (E.D. Pa. Dec. 21, 1995)(concluding that common issues predominated in securities fraud class action where defendants made oral and written misleading representations).

The Court notes that one individual issue causing great problems for certification proponents in cases based upon misrepresentation is not present here - reliance.  Neither the NJCFA nor TILA require proof of reliance.  *See Varacallo v. Mass. Mut. Life Ins. Co.,* 332 N.J. Super. 31, 43 (App. Div. 2000)(NJCFA plaintiffs need not demonstrate reliance on the omissions or

21

misrepresentations of defendants); *Schnall*, 279 F.3d at 217-18 (reliance not an element of TILA claim).[7]  Moreover, AMX has not pointed to any individual issues that threaten to overwhelm class treatment of the breach of contract and unjust enrichment claims. Given the allegation that AMX engaged in an uniform pattern of improper conduct toward all proposed class members, common issues will predominate the proof of these claims as well.  The Court thus concludes that common issues predominate, satisfying the first requirement of Rule 23(b)(3).

2. Superiority

"The superiority requirement asks the court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998).  Rule 23(b)(3) sets out four factors relevant to the superiority inquiry: "(A) the interest of the members of the class in individually controlling

---

[7]Additionally, the calculation of damages, if justified, does not raise any extensive individual issues and may, in some instances, be susceptible to a mathematical or formulaic computation based upon the difference between the interest rates in the "lock in" agreements and the interest rates on the loans the class members actually received.  *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977)("it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.").

the prosecution or defense of separate actions; (B) the extent
and nature of any litigation concerning the controversy already
commenced by or against members of the class; (C) the
desirability or undesirability of concentrating the litigation of
the claims in the particular forum; (D) the difficulties likely
to be encountered in the management of a class action." Fed. R.
Civ. P. 23(b)(3).

The Court first observes that while the potential recovery
for each proposed class member may not be insubstantial (Dal
Ponte alleges that his claim based upon two loan applications is
worth $27,000), it may not be large enough to cover the costs of
what likely will be extensive litigation of these claims. There
appear to be no other lawsuits pending against AMX based upon
these events.

Furthermore, given that this case focuses on the alleged
uniform cancellation scheme of AMX, many of the questions will be
answered by common proof, thus making it desirable to concentrate
the litigation in one forum. The Court notes that AMX is
headquartered in Cherry Hill, New Jersey, only a few miles from
this courthouse, making concentration of the litigation in the
District of New Jersey especially convenient for AMX.

The Court does not foresee any undue difficulties in the
management of this class action, as the proposed class members,
while sufficiently numerous, are not indefinite or immense in

number, and should be identifiable from the records of AMX.

Their claims are based on common allegations and there is no

indication of any individualized claims that could create

conflicts within the class.  The Court concludes that the

proposed class meets both the predominance and superiority

requirements for certification under Rule 23(b)(3).

Accordingly, the Court will grant Dal Ponte's motion for

class certification, based upon the following class definition:

> All consumers who applied for a loan with the Mount
> Laurel office of Defendant American Mortgage Express
> between May 1, 2003 and July 23, 2003, paid for a
> locked-in interest rate, and were not given the locked-
> in interest rate by Defendant.

(Pl. Br., Cert. Mot., at 10.)


### III.

AMX has also filed a cross-motion for summary judgment

pursuant to Fed. R. Civ. P. 56(c).[8]  It argues that it had no

---

[8] Under Rule 56(c), a court may grant summary judgment "if
the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-
moving party may not simply rest on its pleadings to oppose a
summary judgment motion but must affirmatively come forward with
admissible evidence establishing a genuine issue of fact.  *Id.*
In deciding a motion for summary judgment, the court must
construe the facts and inferences in a light most favorable to
the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794
F.2d 860, 864 (3d Cir. 1986).  The role of the court is not to
"weigh the evidence and determine the truth of the matter, but to
determine whether there is a genuine issue for trial."  *Anderson*

agreement with Dal Ponte to *approve* his loan applications at the locked in interest rate, and that Dal Ponte's failure to timely submit the required subordination agreement and title report justified AMX's denial of his loan applications.  The Court concludes that Dal Ponte has raised significant and material issues of disputed fact and that AMX is not entitled to judgment on his claims.

As discussed above, Dal Ponte spoke on the phone with Lewandowski, an AMX loan officer.  He maintains that Lewandowski told him that he could lock in a 4.25% interest rate by paying a $375 fee for each loan.  Lewandowski then filled out interest rate lock forms.  (Cohen Cert., Ex. 2)  He also forwarded Dal Ponte's information to AMX employees who sent out standard application packages to Dal Ponte, including the "Interest Rate Lock In Agreement" forms.  This package included a cover letter stating: "Please be advised that due to the time sensitive nature of your rate lock-in agreement, we can only honor your interest rate lock agreement upon receipt of your signed loan application within 10 days (including weekends and holidays) of the date of this letter: 06/15/03."  (Opp'n to Mot. for Summ. J., Moffa Decl., Ex. A)(underline in original).

In relevant part, the "Interest Rate Lock In Agreement"

_v. Liberty Lobby, Inc._, 477 U.S. 242, 249 (1986).

25

included in Dal Ponte's loan application packages provides that:

> I **DO** WANT AN INTEREST RATE LOCK IN AT THIS TIME
>
> A. My guaranteed interest rate will be: <u>4.25%</u>
>
> . . .
>
> C. This Agreement will end on <u>7/29/03</u> (called the "Ending Date"). The guaranteed interest rate above is good only up to the Ending Day. After the Ending Date, the interest rate will be null and void, unless I obtain a new Interest Rate Commitment, set by Lender within _____ calendar days before my settlement.
>
> . . .
>
> I. If my loan application is approved **AND** my loan settles by the Ending Date, my Interest Rate Lock In Fee will not be credited against the Total Fees.
>
> . . .
>
> III. (1) My Interest Rate Lock In Fee **WILL NOT** be either refunded **OR** credited against the Total Fees **AND** (2) My rate and Total Fee will be **VOID** if:
> - I fail to promptly provide all necessary information of [sic] otherwise co-operate; . . .
>
> V. The Lender in [sic] not responsible for any delay in settlement due to delays caused by agents. Agents mean any person on [sic] entity requested, contacted to supply information, or documentation to the Lender, including but not limited to, the seller, attorneys, depository institutions, employers (current or previous), spouse, surveyor, realtor, title insurance companies, insurer, creditor, builder, etc. **The Lender will make a good faith effort to process the mortgage loan application and stand ready to fulfill the terms of its commitment before the expiration date of the Interest Rate Lock In Agreement and any extension thereof.**
>
> I UNDERSTAND THAT THIS INTEREST RATE LOCK IN AGREEMENT IS NOT AN APPROVAL OF MY LOAN APPLICATION OR A COMMITMENT BY THE LENDER TO MAKE A LOAN. . . .

> This Interest Rate Lock In Agreement is not valid
> unless I have made a choice and both I and an
> authorized Lender representative have signed bellow
> [sic].[9]

(Cohen Cert., Ex. 4)(underlining, capitalization and emphasis in

original).  The "Interest Rate Lock In Agreement" for Dal Ponte's

Los Angeles property is signed by Dal Ponte, his wife, and

Lewandowksi.

AMX asks this Court to hold that despite the language of the

"Interest Rate Lock In Agreement," it was not bound to do

anything unless Dal Ponte complied with every technical detail of

the loan applications and his applications were approved by the

underwriters.  In determining the meaning and import of the

"Interest Rate Lock In Agreement," the Court is guided by the

principle that it should avoid interpreting contractual language

in such a way as to render any term of the contract meaningless

or superfluous.  *Penske Logistics, Inc., v. KLLM, Inc.*, 285 F.

Supp. 2d 468, 474 (D.N.J. 2003) ("Under the principles of

contract interpretation, a contract should not be given an

interpretation which renders a term or terms superfluous or

meaningless. . . ."); Restatement (Second) of Contracts § 203

("[A]n interpretation which gives a reasonable, lawful, and

---

[9] The Certification refers to these documents as "true and
correct copies of *samples* of the Dal Ponte loan application
documents."  (Cohen Cert., ¶ 6) (italics added).  It is not clear
to the Court why these documents are referred to as copies of
"samples" or whether they are complete copies of Dal Ponte's
actual loan application documents.

effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect. . . .").  The Court cannot accept AMX's position, as it would effectively render the terms of the "Interest Rate Lock In Agreement" inoperative.

To the contrary, this agreement, separate from any loan commitment or approval, commits AMX to provide a 4.25% interest rate on the loan, should it be approved and settled within the "lock in" period.  Dal Ponte arguably paid a fee to secure this interest rate commitment.  Dal Ponte signed and timely returned the "Interest Rate Lock In Agreement" along with his application package.  The document states that "[t]his Interest Rate Lock In Agreement is not valid unless I have made a choice and both I and an authorized Lender representative have signed bellow [sic]." (Cohen Cert., Ex. 4) Dal Ponte chose the option "I **DO** WANT AN INTEREST RATE LOCK IN AT THIS TIME" and the document was signed by Dal Ponte, his wife and Lewandowski.  (Id.)  The Court cannot conclude that this document did not comprise an agreement by AMX to provide a 4.25% interest rate on the loan, should the application be approved, in return for Dal Ponte's payment of a fee.

Moreover, under New Jersey law, "[e]very party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of a contract." *Brunswick Hills*

*Racquet Club, Inc., v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224 (2005).  This implied duty requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the full fruits of the contract."  *Ass'n Group Life*, *Inc., v. Catholic War Veterans of the U.S.*, 61 N.J. 150, 153 (1972).

At the very least, the implied duty of good faith and fair dealing here includes AMX's commitment to process loan applications according to its normal procedures and within its normal time frame, to apply its usual underwriting standards and to waive technical defects in loan applications where it would normally do so.[10]  Dal Ponte has presented evidence sufficient to raise a material issue of fact that AMX engaged in an unusual scheme to cancel loans so to avoid making loans with unprofitable locked in interest rates, and that AMX ordinarily would not deny a loan application and void an interest rate lock in agreement based upon the failure to timely submit title work or subordination agreements.  The Court notes that AMX did not notify Dal Ponte that certain documents were missing from his loan applications until after it cancelled his loans, so that he could not take steps to cure the problem prior to the expiration

_____

[10] The Court notes that only a *material* breach of a contractual obligation by one party to a contract excuses the performance of the other party.  *Magnet Resources, Inc., v. Summit MRI, Inc.*, 318 N.J. Super. 275, 285-86 (App. Div. 1998).

date of the "Interest Rate Lock In Agreement."

**IV.**

For the reasons given above, the Court will grant Dal Ponte's Motion for Class Certification and deny AMX's Cross-Motion for Summary Judgment.  The Court will enter an appropriate order.


Date: August  17 , 2006


                                    s/Joseph E. Irenas
                                    _____
                                    JOSEPH E. IRENAS
                                    Senior United States District Judge